FILED

00 MAR 31 PM 4: 17

. . . : : : ST COURT
. . . : : . . . . LORIDA
TAMPA, FLORIDA

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

THE OCEAN CONSERVANCY, et al.,

        Plaintiffs,

-vs-                                  Case No.  8:01-cv-1399-T-24EAJ

DONALD L. EVANS, et al.,

        Defendants.

_____

THE OCEAN CONSERVANCY, et al.,

        Plaintiffs,

-vs-                                  Case No.  8:02-cv-163-T-24EAJ

DONALD L. EVANS, et al.,

        Defendants.

_____

## O R D E R

     This cause comes before the Court for consideration of the Ocean Conservancy and the National Audubon Society's ("Plaintiffs") Motion for Summary Judgment (Doc. No. 36), Donald L. Evans, in his official capacity as Secretary of the U.S. Department of Commerce, the National Oceanic & Atmospheric Administration, and the National Marine Fisheries Service's (collectively referred to as "NMFS" or "Federal Defendants") Motion for Summary Judgment (Doc. No. 44), Southern Offshore Fishing Association, Robert Spaeth, Fisherman's Ice & Bait, Inc. d/b/a Madeira Beach Seafood, Willie R. Etheridge Seafood Co., Inc., Russell Hudson, Dewey Hemiliright, and Agger Fish Corporation's (collectively referred to as "Defendant-Intervenors") Motion for Summary

*60*

Judgment (Doc. No. 48), and the parties' responses and replies thereto.

Plaintiffs are challenging the Federal Defendants' actions relating to the management of large coastal shark (LCS) stocks in the Atlantic Ocean and the Gulf of Mexico. Specifically, the Plaintiffs allege that the Federal Defendants have violated the Magnuson-Stevens Fishery Conservation and Management Act (MSA), 16 U.S.C. § 1801 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, and the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

The Federal Defendants' management of large coastal stocks in the Atlantic Ocean and the Gulf of Mexico has been the subject of almost continuous litigation in this district for the past five years. In 1997, shark fishermen and other constituents from the shark fishing industry filed a lawsuit challenging the 1997 commercial catch quotas. See Southern Offshore Fishing Ass'n v. Daley, Case No. 8:97-cv-1134-T-23EAJ. That lawsuit was followed in 1999 with another shark fishing industry suit challenging measures adopted by Federal Defendants in response to a 1998 assessment of Atlantic shark stocks. See Southern Offshore Fishing Ass'n v. Daley, Case No. 8:99-cv-1455-T-23EAJ. Plaintiffs in the present lawsuit challenge the Federal Defendants' actions under a Settlement Agreement that resolved the two prior cases. Although Plaintiffs try to present their allegations as unrelated to or independent of the Federal Defendants' decision to enter into the Settlement Agreement in the prior cases, the conclusion is inescapable that most, if not all, of Plaintiffs' claims are a challenge to the validity of the Settlement Agreement itself.[1]

---

[1]"The linchpin of this case is that NMFS bound itself through the [Settlement] Agreements to allow an 'independent' peer review panel to determine whether to reinstate the 1999 commercial LCS quota levels or maintain the 1997 quotas. All of NMFS' subsequent actions challenged herein are the direct result of this unlawful delegation." Plaintiffs' Combined Reply (Doc. No. 51 at p. 2).

The cornerstone of the settlement was the agreement for the NMFS to convene an independent scientific review of the 1998 Atlantic shark stock assessment. In accordance with the Settlement Agreement, because a majority of the independent reviewers concluded that the scientific conclusions and scientific management recommendations contained in the 1998 stock assessment were not based on scientifically reasonable uses of appropriate fisheries stock assessment techniques and/or best available biological and fishery information relating to Atlantic large coastal sharks, NMFS announced that the 1997 catch quotas would remain in effect pending completion of a new stock assessment in 2002.

The Settlement Agreement itself was achieved after protracted litigation and court-mandated mediation. Plaintiffs in the present case participated as amicus curiae throughout the litigation in the two prior cases. Although the Plaintiffs here did not participate in the settlement negotiations in the two prior cases, Judge Merryday considered their objections before entering the settlement.

I. BACKGROUND

A.   Legal Framework

1. *The Magnuson-Stevens Fishery Conservation and Management Act (MSA)*

The Secretary of Commerce has the primary responsibility under the MSA to prepare and implement fishery management plans (FMPs) identifying conservation and management measures for Atlantic sharks and other "highly migratory species."[2]  16 U.S.C. §§ 1852(a)(3); 1853(a); 1854(c)(1)(C); 1854(g)(1). All FMPs and implementing regulations must be consistent with the ten national standards for fishery conservation and management set out in § 301 of the MSA. 16 U.S.C.

---

[2]The term "highly migratory species" means tuna species, marlin, oceanic sharks, sailfishes and swordfish. 16 U.S.C.§ 1802(20).

§ 1851(a).[3]  Of particular relevance to Plaintiffs' claims in the instant case is National Standard 2, which provides that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

In 1996, Congress amended the MSA through the Sustainable Fisheries Act (SFA), Pub. L. 104-297, 110 Stat. 3559 (1996).  In particular, the SFA strengthened the MSA by establishing clear requirements to prevent overfishing, rebuild overfished fisheries, and minimize bycatch.  See 16 U.S.C. §§ 1853(a)(10), (11).

2. *The National Environmental Policy Act (NEPA)*

The purpose and intent of NEPA is to focus the attention of the federal government and the public on a proposed action so that the consequences of the action can be studied before the action is implemented and potential negative environmental impacts can be avoided.  42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c); Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989).  To that end, NEPA requires the preparation of an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA mandates the procedures by which agencies must consider the environmental impacts of their actions, but does not dictate the substantive results.  See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).

Not every federal action or proposal requires preparation of an EIS.  Where the environmental impacts of an action are less than significant, an agency may comply with NEPA through preparation of an environmental assessment (EA) and a finding of no significant impact

---

[3]NMFS' advisory guidelines based on these standards are codified at 50 C.F.R. §§ 600.305-340. NMFS first published these guidelines on Sept. 15, 1976, 41 Fed. Reg. 39,441, and has amended them on numerous occasions since the first publication.

(FONSI). See 40 C.F.R. §§ 1501.3; 1501.4(c), (e); 1508.9. An EA provides sufficient evidence and analysis for determining whether an action has significant environmental impacts and includes "brief discussions of the need for the proposal, of alternatives . . ., [and] of the environmental impacts of the proposed action and alternatives. . . ." 40 C.F.R. § 1508.9.

3. *Administrative Procedure Act (APA)*

The APA generally requires agencies to publish proposed substantive rules in the Federal Register and accept public comment before making them effective. 5 U.S.C. § 553(b)-(c). There is an exception, however, when no other statute requires notice or a hearing and "the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

4. *Standard and Scope of Review*

The appropriate standard for judicial review of the Federal Defendants' decision to promulgate the challenged emergency rule is the arbitrary and capricious standard under the APA, 5 U.S.C. § 706(2)(A). See e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538 (11th Cir. 1990) (applying arbitrary and capricious standard in review under NEPA); Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1460 (9th Cir. 1987) (applying arbitrary and capricious standard under the MSA). See also Environmental Coalition of Broward County, Inc. v. Myers, 831 F.2d 984, 986 (11th Cir. 1987) (courts should give deference to the agency determination in the case of "complex environmental statutes such as the Clean Water Act."). In applying the arbitrary and capricious standard, the focal point for judicial review should be the administrative record that was before the agency at the time of the decision, not some new record made initially in the reviewing court. See

5

Camp v. Pitts, 411 U.S. 138, 142 (1973). The Supreme Court has explained the deferential nature of the arbitrary and capricious standard of review:

> [The reviewing court] must consider whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Overton Park, 401 U.S. at 416.

Congress entrusted decisions regarding fisheries management under the MSA to the Secretary of Commerce, who in turn has delegated these responsibilities to the National Marine Fisheries Service, recognizing that such decisions involve balancing many complex, highly technical factors within that agency's special expertise. See, e.g., Kramer v. Mosbacher, 878 F.2d 134, 135 (4th Cir. 1989) (Congress delegated to NMFS by and through the Secretary of Commerce "broad authority to manage and conserve coastal fisheries"). "When examining this kind of scientific determination... a reviewing court must generally be at its most deferential." Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983); see also Marsh, 490 U.S. at 377.[4] De novo review cannot be reconciled with the complex, technical requirements for conservation and management of fishery resources under the MSA.[5]

The standard of review for claims under the MSA, NEPA, and the APA itself is supplied by the APA, 5 U.S.C. § 706(2). The Court should hold unlawful and set aside any of NMFS'

---

[4] See e.g., United States v. Ward, 618 F. Supp. 884, 900 (E.D.N.C. 1985) ("In the end, however, the EPA is required to act upon the informed scientific opinion of its employees. The agency's decision is, therefore, entitled to great deference from this court.").

[5] Even in the case of "specialists express[ing] conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive." Marsh, 490 U.S. at 378.

challenged actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

"Judicial review of an informal administrative agency decision focuses first upon whether the administrator acted within the scope of his or her authority, and, second, upon whether the administrator's decision was arbitrary and capricious." City of Pompano Beach v. F.A.A., 774 F.2d 1529, 1539 n.10 (11th Cir. 1985)(citing Overton Park, 401 U.S. at 416).

"In an APA case, the factfinding capacity of the district court is typically unnecessary. The Court is to decide, on the basis of the record the agency provides, whether the actions pass muster under the appropriate APA standard of review." Loggerhead Turtle v. County Council of Volusia County, 120 F. Supp. 2d 1005, 1013 (M.D. Fla. 2000). "Since the Court determines the issues based on the agency's administrative record, a trial is generally unnecessary and summary judgment is often appropriate." Id. at 1011-12.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file that there are no genuine issues of material fact that should be decided at trial. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604 (11th Cir. 1991). When the party moving for the summary judgment bears the burden of persuasion on the issue at trial, its showing must sustain the burden as well as demonstrate the absence of a genuine dispute.

See Celotex, 477 U.S. at 331-32.  Therefore, the moving party must satisfy both the initial burden of production on the summary judgment motion, by showing that no genuine dispute exists as to any material fact, and the ultimate burden of persuasion on the claim, by showing that it would be entitled to a directed verdict at trial.  When the party moving for the summary judgment does not bear the burden of persuasion on the issue at trial, the moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case.  See id. at 325.  Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim.  See id.  When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial.  Id. at 324.  In the instant case, the facts underlying the Plaintiffs' claims in this action are documented in the Administrative Record before this Court.  Therefore, the relevant legal inquiry centers on whether the disputed actions are supported by the Administrative Record in this case.

In sum, this Court may not substitute its judgment for the NMFS' expertise, nor may it substitute an objecting party's preferences for that of the agency.  See Overton Park, 401 U.S. at 416.  Accordingly, NMFS' decisions are to be upheld unless Plaintiffs can demonstrate, on the Administrative Record, that the challenged decisions were arbitrary and capricious or not otherwise in accordance with law.

B.   <u>Factual Background</u>[6]

1.   *The 1993 Fishery Management Plan*

Federal management of the Atlantic shark fishery began in 1993 with the adoption of the final

Fishery Management Plan (FMP) for Atlantic sharks.  <u>See</u> 58 Fed. Reg. 21,949 (April 26, 1993).

The 1993 FMP imposed various management measures directed to stop overfishing of large coastal

sharks (LCS) and to prevent the overfishing of small coastal sharks (SCS) and pelagic sharks.  For

example, the 1993 FMP created a federal permitting system and established the first commercial

catch quotas imposed on the fishery and the first recreational bag limits.  The FMP also banned the

practice of "finning" (removing only the fins and discarding the remainder of the shark into the sea,

resulting in death) and established a comprehensive and mandatory system for data collection and

reporting.  Under the 1993 FMP, NMFS received information concerning possible changes in fishery

management measures from a science body called the Shark Evaluation Workshop (SEW).  The

SEW included NMFS, industry, environmental, and independent scientists convened by NMFS to

evaluate available data on sharks and to consider management implications of stock assessment

results.  NMFS summarized deliberations of the SEW in an SEW report.

a.   The 1996 SEW

NMFS convened the 1996 SEW meeting in June 1996. The SEW report, prepared by

NMFS to summarize the SEW deliberations and to evaluate management implications, appears in

the Administrative Record at A.R. 3-110.  Reviewing 1995 catch data, the SEW reported that in

---

[6]The facts underlying this action are undisputed by the parties.  Accordingly, the Court
has adopted the facts in relevant part as set forth in Federal Defendants' Combined Memorandum
in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross-Motion for
Summary Judgment (Doc. No. 45).

1995 the documented U.S. commercial landings of large coastal sharks were 3,117 metric tons dressed weight. Id. at 9. Recreational harvests of large coastal sharks were estimated to be about 780 metric tons. Id. The SEW used three population models to assess population levels of large coastal sharks: a demographic model, a production model, and a maximum likelihood model. The SEW acknowledged that each approach had certain strengths and weaknesses. Id. at 12.

Available data, viewed using the three modeling approaches, indicated a statistically significant negative trend in catch rates over time for 19 of 26 individual species or species groups studied. Id. at 4. However, there was no statistically significant evidence that shark stocks were either increasing or decreasing since management under the FMP began. Id. at 5. The SEW concluded that, even though NMFS had already instituted catch limits (the 1995 catch was only 48% of the peak estimated catch of 1983), additional reductions of fishing mortality of 50% or more would be needed to stabilize and potentially to begin recovering stocks of large coastal sharks. Id. at 22-23.

      b.    1997 Interim Regulations

Considering the findings of the 1996 SEW, the Secretary determined in late 1996 that sharks remained overfished despite the various conservation measures undertaken since the 1993 FMP. Therefore, on April 7, 1997, NMFS issued a final rule reducing commercial quotas for large coastal sharks by half, maintaining the quota for pelagic sharks, and establishing a quota for small coastal sharks.[7] See 62 Fed. Reg. 16,648. The Secretary adopted the 1997 catch quotas as a risk-averse,

---

[7]The final rule also implemented other measures to conserve Atlantic shark stocks, including the reduction of recreational bag limits, establishment of a catch-and-release only fishery for white sharks and prohibitions on possession of four other species, and prohibition of filleting at sea. See 62 Fed. Reg. 16,648. The rule also restated and re-emphasized the 1993 FMP's requirements for species-specific identification by all owners or operators, dealers, and

interim measure to achieve an immediate 50% reduction in fishing mortality as the Secretary continued to develop a long-term rebuilding schedule. See id. at 16,648.

2.   *The Prior Lawsuits*

In the prior lawsuits, the shark fishing industry plaintiffs challenged the 1997 commercial catch quotas. Among other claims, the industry plaintiffs argued that the quotas were based on unproven scientific models that failed to account for the effects of shark migration and fishing by other countries. In a decision issued February 24, 1998, Judge Merryday found that the quotas were based upon the best available scientific information, in accordance with National Standard 2:

> The administrative record before the Court evinces a healthy debate (both within NMFS and between NMFS and participating constituencies) which featured noticeably vocal expert opinions both supporting and opposing the means employed by the Secretary .... Judicial review at this juncture is limited to determining whether the Secretary intelligently and knowingly decided on a rational policy, given the scientific and judgmental tools available to him. I find that the Secretary fulfilled the minimum obligations imposed by the APA and National Standard Two.

Southern Offshore Fishing Ass'n v. Daley, 995 F. Supp. 1411, 1432-33 (M.D. Fla. 1998).

Judge Merryday also found that the quotas complied with National Standard 1, noting that "the Secretary's decision to reduce the LCS quotas constitutes a cautious, risk-averse approach, designed to safeguard against further injurious declines in shark stocks and to ensure optimal yield and repopulation." Id. at 1431. Although Judge Merryday found that the quotas complied with National Standards 1 and 2, he ordered the Secretary of Commerce to re-consider on remand the possible socioeconomic effects of the quotas according to provisions of the Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996

---

tournament operators of all sharks landed under the FMP. See id. at 16,652-53.

11

("SBREFA"), 5 U.S.C. § 601 *et seq.*, as well as certain provisions of the MSA, 16 U.S.C. § 1854(g)(1)(G)(ii) and 16 U.S.C. § 1851(a)(8). See id. at 1437. Judge Merryday held that the public interest warranted retaining the quotas in effect during the remand. See id.

a. The Remand

Judge Merryday ordered NMFS "to undertake a rational consideration of the economic effects and potential alternatives to the 1997 quotas." Southern Offshore Fishing Ass'n, 995 F. Supp. at 1437. Citing Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104 (1st Cir. 1997), Judge Merryday directed the NMFS to "submit to the Court an analysis that complies with applicable law" on or before May 15, 1998. Id. Therefore, NMFS was afforded less than three months to complete the requisite analyses on remand. Though not required by the Court's order, NMFS provided a brief public comment period on a draft of the economic analysis. See "Atlantic Shark Fisheries; Notice of Availability," 63 Fed. Reg. 19,239 (April 17, 1998).

On May 15, 1998, NMFS submitted to the Court and to industry plaintiffs an analysis titled "Final Consideration of the Economic Effects and Potential Alternatives to the 1997 Quotas on the Atlantic Large Coastal Shark Fishery" (hereinafter referred to as "Remand Submission"). NMFS determined that the 1997 quotas may result in significant economic effects on a substantial number of fishery participants. See Remand Submission at 3. NMFS considered possible alternatives to the quotas and determined that "there were no available alternatives that could reduce economic impacts without possibly jeopardizing the long term viability of the LCS stocks, and thus the fishery." Id. at 3. Accordingly, NMFS concluded that the 1997 quotas "were the only viable alternative to ensure that the LCS stocks would not decline further as that rebuilding program was established and minimized to the extent practicable the economic effects in both the short-term and long-term." Id.

In the Remand Submission, NMFS specifically advised the Court that NMFS was preparing to convene a new SEW to analyze non-quota alternatives during 1998:

> NMFS is also holding a 1998 SEW to analyze some of these alternatives. These alternatives include but are not limited to time/area closures, establish additional prohibited sharks, and trip/bag changes. These alternatives are not discussed here but may be fully discussed in the proposed [Highly Migratory Species] FMP and the 1998 SEW report....

Remand Submission at 33. See also Remand Submission at 35 ("NMFS is continuing to consider minimum size limits as possible alternatives to quota adjustments in the development of the rebuilding program, in conjunction with the HMS AP and the 1998 SEW."). NMFS filed a copy of the SEW report with the Court on or about September 28, 1998.

b.   The Special Master Proceedings

Upon an initial review of the Remand Submission and the industry plaintiffs' objections, the Court expressed concern regarding the sufficiency of NMFS' analysis of less restrictive alternatives to the quota reduction: "the defendant affords minimal treatment to more realistic and constructive alternatives such as minimum size limits, nursing and pupping area closures, and staggered closures." Order dated October 17, 1998 at 6. Over the NMFS' objections, the Court appointed a special master to analyze the Remand Submission with respect to the availability of workable alternatives to the 1997 quotas.

After Judge Merryday appointed the Special Master, the parties stipulated to stay the special master proceedings while pursuing Court-mandated mediation and settlement discussions. Meanwhile, NMFS was in the process of preparing a new "Fishery Management Plan for Atlantic Tunas, Swordfish and Sharks" (HMS FMP).[8] NMFS published a "Notice of Availability" of the

---

[8]In September 1997, the Secretary, by and through NMFS, issued a report to Congress identifying LCS as "overfished," pursuant to 16 U.S.C. 1854(e)(1). Report to Congress, "Status

Draft FMP for LCS and other highly migratory species ("HMS") in the Federal Register on October 26, 1998. See 63 Fed. Reg. 57,093. NMFS subsequently proposed regulations in accordance with the preferred alternatives from the draft FMP on January 20, 1999. See 64 Fed. Reg. 3,154.

NMFS adopted the final HMS FMP in April 1999. NMFS published the Final Rule to implement the HMS FMP on May 28, 1999. See 64 Fed. Reg. 29,090. The rule included new 1999 shark quotas to achieve long-term stock recovery in accordance with the mandate of Congress at 16 U.S.C. § 1854(e) and the rebuilding schedule set forth in the HMS FMP.[9] In addition to new quotas, the rule also included a suite of other management measures for sharks, including minimum sizes and a more species-specific management approach than utilized in the past.

Settlement negotiations in the prior lawsuit broke down around the time NMFS issued the final rule to implement the HMS FMP, and the industry Plaintiffs filed a motion to hold the Secretary of Commerce in contempt for promulgating the new shark fishing regulations. On June 30, 1999, Judge Merryday enjoined NMFS from implementing new management measures until the special master completed review of NMFS' actions on remand. See Southern Offshore Fishing Ass'n v. Daley, 55 F.Supp.2d 1336, 1346 (M.D. Fla. 1999). Judge Merryday stated that "with considered

---

of Fisheries of the United States," September 1997. This certification triggered a one-year timetable during which the Secretary had to develop a management plan to end overfishing and to rebuild affected stocks of fish in as short a period of time as possible. See 16 U.S.C. § 1854(e)(3). NMFS prepared a fishery management plan to address a rebuilding program for LCS in this context.

[9]As to the necessary time period for ending overfishing and rebuilding the fishery, the MSA specifies that the time shall "not exceed 10 years, except in cases where the biology of the stock of fish, other environmental conditions, or management measures under an international agreement in which the United States participates dictate otherwise." 16 U.S.C. § 1854(e)(4)(A)(ii). Due to the relatively long reproductive cycles of large coastal sharks, NMFS has adopted a 39-year rebuilding schedule for the sandbar complex of species and a 30-year rebuilding schedule for the blacktip complex of species. See 64 Fed. Reg. at 29,107.

and purposeful delay, NMFS elected to circumvent unilaterally the judicial process and achieve its desired goals at the expense of justice and fair play. The defendant's litigation position has adulterated into evasion." Id. Judge Merryday noted the Court had "inherent authority and jurisdiction to require *bona fide* compliance with its February 24, 1998, order and other pertinent orders...." Id. at 1346. By virtue of the Court's order, the 1997 quotas remained in place.

On October 1, 1999, the Special Master issued recommended findings of fact and conclusions of law. See Case No. 8:97-cv-1134-T-23EAJ, Doc. No. 123. The Special Master's report found that NMFS reasonably determined that there were no available alternatives to the 1997 LCS quotas but also concluded that NMFS's decision to reject alternatives to lowering fishing quotas "constituted bad faith and a lack of candor to the Court." Id. The Special Master based this finding on two factors: 1) the agency's characterization of the universe of affected fishers in the Remand Submission on alternatives to the 1997 quotas; and 2) the agency's representations to the Court concerning the proceedings of the 1998 stock assessment, which was being conducted at the same time that NMFS was working on the Remand Submission. See id. NMFS filed extensive objections to the Special Master's report.

Meanwhile, as the special master proceedings were pending, the shark fishing industry plaintiffs filed a new lawsuit challenging the final rule that implemented the new management measures. Southern Offshore Fishing Ass'n v. Daley, Case. No. 8:99-cv-1455-T-23EAJ. As in the lawsuit challenging the 1997 interim quotas, industry plaintiffs raised various claims under the MSA and the RFA. In particular, they disputed NMFS' reliance upon a new statistical model on which the

15

new quotas were based.[10] By late 1999, the parties completed expedited briefing on the merits of the new lawsuit, and NMFS filed a motion to dissolve the injunction on the new management measures. Pending the Court's ruling on that motion, the injunction remained in effect through 2000.

On or about November 24, 2000, the parties reached a settlement of all claims in both cases and filed a joint motion with the Court to adopt the settlement. The Court entered an order granting the parties' joint motion on December 7, 2000, vacating the injunction, and dismissing the case. See Southern Offshore Fishing Ass'n v. Mineta, 2000 WL 33171005 (M.D. Fla. Dec. 7, 2000). In that order, the Court denied a motion to intervene that had been filed by four environmental groups (including the Plaintiffs in the instant case, the National Audubon Society and the Ocean Conservancy (formerly Center for Marine Conservation)). Id. at *1. The Court also noted that it considered "Objections to the Settlement Agreement" filed by the *amici* and found the objections "insufficient to warrant denial of the parties' motion to approve their lawful settlement agreement, which was accomplished only after protracted, detailed, and arduous negotiation between the parties." Id. The amici groups did not appeal the order denying their intervention.

3.   *Implementation of the Settlement Agreement*

The centerpiece of the Settlement Agreement in the two previous cases was the parties' agreement to a detailed procedure to convene an independent scientific review panel to review the science underlying the challenged management measures set forth in the 1999 final rule. The agreed

---

[10]The 1998 Shark Evaluation Report, on which Federal Defendants relied in promulgating the HMS FMP, differed from previous shark stock assessments in its use of Bayesian statistical analysis. The Bayesian approach replaces unknown parameters by known probability distributions for those parameters observed previously, which are referred to as *priors*. In Case No. 8:99-cv-1455-T-23EAJ, the shark industry plaintiffs alleged that Bayesian analysis is unreliable due to several life history characteristics, such as long life spans among certain shark species.

procedures included, *inter alia*, specific terms of reference setting forth the findings to be made by the independent reviewers, a requirement that the reviewers consider an industry-provided position paper, and confidentiality measures to safeguard the identity of the reviewers pending completion of the review.  The parties agreed that the independent reviewers would be selected through the Center for Independent Experts (CIE) at the University of Miami.  The parties agreed that the 1997 interim commercial quota, which was still then in effect by virtue of the Court's earlier order enjoining the 1999 regulations, would remain in effect pending completion of the independent review.[11]

On March 6, 2001, NMFS issued an emergency rule to re-establish the 1997 interim quota, in accordance with the Settlement Agreement.  See 66 Fed. Reg. 13,441.  NMFS used its express authority under the MSA to issue this emergency rule without prior notice and comment. As noted in the Federal Register notice,

> [t]he [Assistant Administrator for Fisheries] finds that there is good cause to waive the requirement to provide prior notice and an opportunity for public comment pursuant to authority set forth at 5 U.S.C. 553(b)(B), as such provisions would be contrary to public interest.  This emergency rule is necessary to meet the requirements of a court-approved settlement agreement.  Further litigation that could further delay implementation of appropriate quotas is contrary to the public interest, because of the concern that [large coastal shark] stocks would experience further decline during any protracted litigation.

---

[11]The Settlement Agreement stipulated that the 1999 levels would take effect only if a majority of the panelists found that the conclusions and management recommendations contained in the 1998 SEW Report were based on scientifically reasonable uses of appropriate fisheries stock assessment techniques and best available (at the time of the 1998 SEW Report) biological and fishery information relating to Atlantic LCS.

In the Settlement Agreement, NMFS also committed to submit the outcome of the forthcoming stock assessment for LCS to the same independent scientific review process to be completed before NMFS adjusts the fishing quotas or undertakes other management measures for LCS.  NMFS retained the discretion to adjust quotas based on a new stock assessment prior to completion of the peer review if "emergency action is necessary (e.g., due to imminent stock collapse)."

Id. at 13,442.  Although not required by the Settlement Agreement, NMFS' emergency rule also suspended non-quota commercial management measures such as counting state landings and dead discards against future quotas and setting a minimum size for ridgeback LCS.

On June 26, 2001, NMFS published a Federal Register notice that set the opening and closing dates for the second semi-annual 2001 LCS fishing season.  The notice provided background on industry litigation relating to the Atlantic shark fishery and stated that, because independent peer reviews of the 1998 LCS stock assessment were not complete as required under the Settlement Agreement, annual quota levels for LCS would remain at 1997 levels.  Id.

On June 29, 2001, industry plaintiffs and NMFS filed a Joint Status Report to notify the Court concerning the implementation of the parties' Settlement Agreement.  The parties notified the Court that the scientific reviews completed to date did not conform to the criteria set forth in the Settlement Agreement in several material respects.  First, the Statement of Task transmitted to the panelists by the CIE differed from the Statement of Task incorporated in the parties' Settlement Agreement, and consequently, the reviews prepared by the individual panelists did not meet the requirements of the Settlement Agreement.  Second, the industry position paper was timely submitted by industry plaintiffs pursuant to Section 3(c)(iii) of the Settlement Agreement but was not transmitted to the individual panelists for consideration in their reviews.  Third, the CIE inadvertently disclosed to NMFS' designees the identity of one of the three panelists prior to completion of that panelist's review.  Further, the CIE released to NMFS' designees, who provided the commercial fishing interests a copy, the reviews prepared by two panelists that were not in conformance with the Settlement Agreement.

Accordingly, the parties negotiated amendments to the Settlement Agreement (Amended

Settlement Agreement), filed with the Court on or around July 25, 2001, to provide for a new independent review panel to be convened to fulfill the parties' intent in the original Settlement Agreement. The new independent review panel was convened by Natural Resources Consultants, Inc. (NRC). In accordance with the same procedure contemplated in the original Settlement Agreement, the amendments specified that the 1997 interim quotas would remain in effect pending completion of the new independent review. The parties agreed that revised reports from the CIE reviewers could be considered by the agency in future stock assessments but would not be used to fulfill the terms of the parties' settlement.

Judge Merryday denied all pending motions in the case, including the motion to amend the Settlement Agreement, finding that the Court lacked jurisdiction to rule on the motions because it had previously dismissed the case with prejudice. Therefore, the Amended Settlement Agreement never received court approval.

On October 8, 2001, NMFS received five reviews procured through NRC under the amendments to the Settlement Agreement. Under the terms of the amendments to the Settlement Agreement, to ensure that the names of the reviewers were not released to staff before the review documents were deemed complete by counsel, NMFS staff did not find out the results or even see the reviews until the last week of October. NMFS received three completed reviews from the CIE during the same general time period. Because one of the NRC reviewers had participated in the CIE review, NMFS evaluated the findings of the four remaining NRC reviewers for purposes of determining whether a majority of the independent reviewers concluded that the scientific conclusions and scientific management recommendations contained in the 1998 stock assessment were or were not based on scientifically reasonable uses of appropriate fisheries stock assessment

techniques and/or best available biological and fishery information relating to Atlantic LCS. Three of the four remaining NRC reviewers concluded that the scientific conclusions and scientific management recommendations contained in the 1998 SEW Report were not based on scientifically reasonable uses of appropriate fisheries stock assessment techniques and/or best available (at the time of the 1998 SEW Report) biological and fishery information relating to Atlantic LCS.

On December 28, 2001, in accordance with the terms of the Settlement Agreement, NMFS issued an emergency rule to retain the 1997 LCS quotas pending further rulemaking following completion of the next LCS and SCS stock assessments by the NMFS Southeast Fisheries Science Center, which was scheduled to be completed in 2002.[12] Although not obligated by the Amended Settlement Agreement, NMFS also continued the suspension of non-quota commercial management measures for LCS. See 66 Fed. Reg. 67,118 (December 28,2001); A.R. 3-150. Noting that it would be impracticable to provide prior notice and opportunity for public comment, the emergency rule stated that there is good cause to waive the requirement to provide prior notice and an opportunity for public comment. Id. at 67,121. Accordingly, the emergency rule specifies that NMFS was accepting comments for 90 days through March 28, 2002. Id. at 67,120. Based on any comments and the results of the LCS and SCS stock assessments, the emergency rule states that "NMFS will modify these regulations through a standard rulemaking process as appropriate." Id.

On May 29, 2002, NMFS published a notice extending the expiration date of the emergency rule at issue in this case to and including December 30, 2002, unless otherwise modified or superseded through publication of a closure notice in the Federal Register. See 67 Fed. Reg. 37,354.

---

[12]NMFS completed an environmental assessment (EA) on December 17, 2001, with an associated finding of no significant impact (FONSI).

4.   *Recent Developments*[13]

In the May 29, 2002 Federal Register notice, NMFS also announced that it intended to implement new management measures for LCS and SCS by January 1, 2003, through notice and comment rulemaking based on the results of the 2002 LCS and SCS stock assessments. The SCS assessment was finalized in March 2002. The 2002 LCS SEW was held on June 24-28, 2002.

On July 12, 2002,[14] NMFS notified the Court that, given the large number of papers to be reviewed from the 2002 LCS SEW; issues raised at the SEW; the peer review process for the 2002 LCS stock assessment, which was required under the court-approved Settlement Agreement; and the need to develop new management measures and conduct environmental, social, and economic analyses of those measures, it was unlikely that the agency would be able to conduct full notice and comment rulemaking on Atlantic shark management measures by January 1, 2003. NMFS further stated that it may implement interim measures by January 1, 2003, while developing longer-term management measures pursuant to full notice and comment rulemaking after that date.

On December 20, 2002, NMFS approved and sent to the Federal Register an emergency rule, establishing Atlantic shark management measures on an interim basis to be effective January 1, 2003. On January 24, 2003, the Plaintiffs filed a separate action also before this Court against the Federal Defendants, Case No. 8:03-cv-124-T-24EAJ, challenging the December 2002 decision by the Federal Defendants to increase the annual fishing quota for the 2003 fishing season, suspend the minimum size requirements for ridgeback sharks, and extend the close of the spring fishing season

---

[13]Although the "recent developments" do not directly affect the instant case, they are set forth for contextual purposes.

[14]See Exhibit 2, Federal Defendants' Reply Memorandum in Support of Cross-Motion for Summary Judgment (Doc. No. 53).

21

from April 15th, 2003 to May 15th, 2003 pursuant to MSA, NEPA and the APA.

## II.  DISCUSSION

The Court will address each of the Plaintiffs' arguments in turn.

A.      NMFS' June and December 2001 Rules Violated the Magnuson-Stevens Act

Any FMP, plan amendment, or implementing regulation must be consistent with the MSA's

ten national standards (NS) for fishery conservation and management.  See 16 U.S.C. § 1851(a).

Plaintiffs allege that Federal Defendants violated three national standards in promulgating the June

and December 2001 rules.  Plaintiffs allege that Federal Defendants violated NS 1 by setting LCS

quotas at 1997 levels that it knew would perpetuate overfishing and fail to rebuild overfished LCS

stocks.  Plaintiffs argue that Federal Defendants also violated NS 1 and 9 by suspending non-quota

commercial management measures specifically designed to halt or slow the rate of overfishing and

minimize bycatch.  Finally, Plaintiffs allege that Federal Defendants violated NS 2 by failing to

demonstrate that its decisions were based on the best available scientific information.

1.      *NMFS' Actions Unlawfully Perpetuate Overfishing and Fail to Rebuild Overfished*
        *LCS Stocks*

National Standard 1 requires that "[c]onservation and management measures shall prevent

overfishing while achieving, on a continuing basis, the optimum yield from each fishery." 16 U.S.C.

§ 1851(a)(1).  A fishery is "overfished" if the rate or level of fishing mortality "jeopardizes the

capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C.

§ 1802(29).  In an overfished fishery, the "optimum yield" to be attained under NS 1 must "provide[]

for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery."

16 U.S.C. § 1802(28)(C).  The MSA also requires the Federal Defendants to minimize the adverse

economic impacts of its fishery management decisions to the extent practicable.  See 16 U.S.C. §
1851(a)(8).

Plaintiffs allege that Federal Defendants have violated NS 1 and the MSA's rebuilding
requirements through its June and December 2001 actions in which Federal Defendants released the
LCS quotas for the second half of 2001 and set the quotas for the 2002 fishing seasons at 1997
levels, even though, Plaintiffs allege, they knew that the 1997 quota levels were insufficient to
prevent further overfishing and rebuild the LCS fishery.  Federal Defendants contend that under the
unique facts and circumstances of this case, NMFS may lawfully continue the 1997 interim quota
without having a rebuilding plan in place.  Specifically, Federal Defendants point to the fact that,
under the terms of the Settlement Agreement approved by Judge Merryday, NMFS cannot implement
a particular rebuilding target for the Atlantic shark fishery because scientific peer reviews conducted
pursuant to the Settlement Agreement found that the 1998 SEW, which supported the 1999 HMS
FMP, was not based on scientifically reasonable uses of appropriate stock assessment techniques
and/or best available science.  NMFS plans to promulgate any necessary rebuilding measures based
on the 2002 stock assessment.

The 1999 HMS FMP set forth a comprehensive rebuilding plan for the Atlantic shark fishery.
The implementing regulations issued in 1999 included quota and non-quota measures to rebuild the
fishery over a period of 30-40 years.  Judge Merryday enjoined the 1999 HMS implementing
regulations and the 1997 interim quotas have remained in effect ever since - first under the terms of
Judge Merryday's order and then under the terms of the Settlement Agreement in the prior litigation.
NMFS' stated goal in adopting the Settlement Agreement and retaining the 1997 quotas was to bring
the previous litigation to a close and thereby enable the agency to reevaluate its rebuilding program

23

in light of the findings of the independent review and a new stock assessment. NMFS felt that if it had declined to enter the settlement, the injunction imposed by Judge Merryday might still be in effect today. The independent scientific review, conducted under the Settlement Agreement, essentially invalidated the stock assessment on which the rebuilding measures were based. A majority of the reviewers independently concluded that the available data was inadequate for determining the current status of shark stocks in light of previous quota reductions.

Defendant-Intervenors argue that the MSA addresses the situation where conservation measures need to be implemented while a rebuilding plan is developed:

> During the development of a fishery management plan, a plan amendment, or proposed regulations required by this subsection [relating to rebuilding overfished fisheries], the Council may request the Secretary [of Commerce] to implement interim measures under section 305(c) [16 U.S.C. § 1855(c)] until such measures can be replaced by such plan, amendment, or regulations. Such measures, if otherwise in compliance with the provisions of this Act, may be implemented even though they are not sufficient by themselves to stop overfishing of a fishery.

16 U.S.C. § 1854(e)(6). Defendant-Intervenors argue that NMFS is able to maintain 1997 LCS quota levels under § 305(c) authority where the bases for the 1998 SEW Report and the 1999 HMS FMP were invalidated.

This case is simply not typical for purposes of analyzing whether or not Federal Defendants violated NS 1. However, the Court finds that the Federal Defendants acted in what they believed to be the best interests of the long-term health of the fishery. The Secretary's decision to enter into the Settlement Agreement and to retain the 1997 quotas was an effort to safeguard against the possibility that interminable litigation with the shark industry plaintiffs in the two prior cases would impede the Secretary from implementing necessary conservation measures. The 1999 stock assessments were rejected by an independent panel of experts, and the science underlying the 1997

24

quotas was the best science available to the Federal Defendants.

The Court in this case must defer to the Federal Defendants' reasoned decision, based on what they determined to be the best available science, in "making difficult policy judgments and choosing appropriate conservation and management based on their evaluations of the relevant quantitative and qualitative factors." National Fisheries Inst., Inc. v. Mosbacher, 732 F. Supp. 210, 223 (D.D.C. 1990). While Plaintiffs may dispute the degree to which the quotas will promote long-term stock rebuilding, Federal Defendants have clearly identified a rational, scientific basis for the chosen quotas. See Pacific Coast Fed'n of Fishermen's Ass'n v. Secretary of Commerce, 494 F. Supp. 626, 634 (N.D. Cal. 1980)("While the plaintiffs contest the validity of the scientific data concerning the extent of salmon stocks, the Court should not substitute its judgment for that of the agency. The Court cannot say that there is no rational basis for the scientific conclusion reached by the Council.")(citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974) & Maine v. Kreps, 563 F.2d 1043, 1050 (1st Cir. 1977)).

Plaintiffs also argue that NMFS violated NS 1 by continuing the suspension of non-quota commercial management measures for LCS stocks in the December 2001 emergency rule. Plaintiffs contend that Federal Defendants' decision to suspend these non-quota measures is all the more egregious because the Amended Settlement Agreement did not require NMFS to suspend the non-quota measures. The non-quota measures were implemented to "account for all sources of mortality in assessing an annual harvest level" and to "reduce that available quota by the amount of shark discarded dead and the amount harvested in state waters after Federal fishery closures." AR 1, Ch. 3 at 104. NMFS also subdivided the LCS species into ridgeback and non-ridgeback subgroups with separate quotas for each subgroup and set a minimum size for the ridgeback subgroup. Federal

Defendants contend that they decided not to implement the provisions for counting state landings and dead discards against the quota and species-specific minimum size regulations after considering the findings of the independent scientific reviewers. NMFS argues that the purpose of subdividing the species into ridgeback and non-ridgeback groups was to allow NMFS to implement a minimum size for sandbar sharks, which are the commercially predominant species in the ridgeback group.[15] NMFS elected not to implement this minimum size measure so that it could be evaluated more fully during the 2002 stock assessment. The Federal Defendants have clearly identified a rational basis for their decision not to implement the non-quota measures, and the Plaintiffs have failed to establish that the Federal Defendants' decision to suspend the non-quota measures was arbitrary and capricious. Accordingly, summary judgment in favor of Federal Defendants on this claim is appropriate.

2.      *NMFS' Suspension of Non-Quota Management Measures Violates the Bycatch Accounting and Minimization Provisions*

The Sustainable Fisheries Act (SFA) added new provisions to the MSA designed to address the serious problem of "bycatch," which is the incidental harvest of fish discarded for economic or regulatory reasons (e.g., the fish are too small, not valuable, or cannot be landed legally). See 16 U.S.C. § 1802(2). Pursuant to National Standard 9 of the MSA, any conservation and management measure implemented by NMFS must "to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." See 16 U.S.C. §§ 1851(a)(9), 1853(a)(11).

---

[15]Because blacktip sharks (the commercially predominant non-ridgeback species) do not segregate in the water by size in the same way as sandbar sharks, NMFS elected not to implement minimum sizes for non-ridgeback species.

NMFS guidelines interpreting NS 9 provide that in evaluating measures under the practicability standard:

> the Councils must consider the net benefits to the Nation, which include, but are not limited to: Negative impacts to stocks; incomes accruing to participants in directed fisheries in both the short and long term; incomes accruing to participants in fisheries that target the bycatch species; environmental consequences; non-market values of bycatch species, which include non-consumptive uses of bycatch species and existence values, as well as recreational values; and impacts on other marine organisms.

50 C.F.R. § 600.350(d). The guidelines further provide that:

> [a] determination of whether a conservation and management measure minimizes bycatch or bycatch mortality to the extent practicable, consistent with other national standards and maximization of net benefits to the Nation, should consider the following factors:
> (A) Population effects for the bycatch species.
> (B) Ecological effects due to changes in the bycatch of that species (effects on other species in the ecosystem).
> (C) Changes in the bycatch of other species of fish and the resulting population and ecosystem effects.
> (D) Effects on marine mammals and birds.
> (E) Changes in fishing, processing, disposal, and marketing costs.
> (F) Changes in fishing practices and behavior of fishermen.
> (G) Changes in research, administrative, and enforcement costs and management effectiveness.
> (H) Changes in the economic, social, or cultural value of fishing activities and nonconsumptive uses of fishery resources.
> (I) Changes in the distribution of benefits and costs.
> (J) Social effects.

50 C.F.R. § 600.350(d)(3).

The non-quota commercial management measures for LCS that NMFS promulgated in the 1999 HMS FMP, which included counting state landings and dead discards against the quota and species-specific minimum size regulations, were also designed to meet the bycatch requirements of the MSA. Plaintiffs allege that because the bycatch accounting and minimization management measures of the 1999 HMS FMP are necessary to comply with the requirements of NS 9, NMFS`

action in suspending them without adequate explanation is arbitrary and capricious.

Federal Defendants counter that they specifically evaluated and decided not to implement the

non-quota measures without further evaluation, based on the findings of independent reviewers and

other social and economic considerations.  The Federal Defendants note that some of the reviewers

agreed with the idea of minimum sizes and counting dead discards, in general, but noted that the

measures adopted in the HMS FMP were not supported by the available data.  Only one reviewer

out of seven specifically agreed with the measures adopted in the HMS FMP.  Some reviewers

recommended that the effect of possible minimum sizes on shark stocks should be evaluated with

potential changes in quota levels, effort changes, or other regulations.  Accordingly, Federal

Defendants contend that they elected not to implement the non-quota measures without further

scientific evaluation and a new stock assessment.  The Federal Defendants argue that while the

settlement did not specifically prohibit NMFS from implementing the non-quota measures, NMFS

determined after considering the results of the independent reviews that it was more appropriate to

have the issues re-examined during the 2002 stock assessment.

As discussed above, the Court finds that the Plaintiffs have failed to carry their burden of

showing that NMFS' decision not to implement certain non-quota management measures was

arbitrary and capricious.  Accordingly, Federal Defendants are entitled to summary judgment on this

claim.

3.    *NMFS Did Not Base Its Actions on the Best Available Scientific Information*

National Standard 2 requires that "[c]onservation management measures shall be based on

the best scientific information available."  16 U.S.C. § 1851(a)(2).  Under the national standard

guidelines, "[s]cientific information includes, but is not limited to, information of a biological,

ecological, economic, or social nature." 50 C.F.R. § 600.315(b)(1). "FMPs must take into account the best scientific information available at the time of preparation." 50 C.F.R. § 600.315(b)(2); see also Southern Offshore Fishing Ass'n, 995 F. Supp. at 1432 ("under the 'best scientific information available' standard, the Secretary must derive his determinations from the sum of pertinent and available information."); J.H. Miles & Co., Inc. v. Brown, 910 F. Supp. 1138, 1151-52 (E.D. Va. 1995)("[T]he Magnuson Act permits the Secretary's designees to act on information that is incomplete or if there are differences in available information."; upholding, under APA "arbitrary and capricious" standard, NMFS' decision to reject newest estimates from surf clam survey because data varied significantly from prior surveys). When NMFS' decisions are reviewed for compliance with NS 2, the agency "warrants cautious deference in matters falling within [its] studied specialty and concerning which equivocal evidence and genuine scientific debate abound." Southern Offshore Fishing Ass'n, 995 F. Supp. at 1425.

Plaintiffs argue that NMFS' actions violated NS 2 in two distinct ways. First, Plaintiffs contend that NMFS' repeated protests that its December 2001 rule was based on the best available science are patently false. Specifically, Plaintiffs argue that NMFS predetermined the outcome of the December 2001 rule by agreeing to the terms of the Amended Settlement Agreement, i.e., if the peer reviewers accepted the 1998 SEW Report, the 1999 quotas would take effect; if not, the 1997 quotas would remain in place. Plaintiffs allege that NMFS left itself no authority whatsoever to review the peer reviews and evaluate for itself what the best available scientific information might be. Rather, Plaintiffs contend, NMFS abdicated its legal duty to analyze and apply scientific information in implementing conservation management measures for LCS. Second, Plaintiffs argue that NMFS failed to comply with NS 2 because its decisions were not based on all available, current

scientific information.

As for Plaintiffs' first argument that NMFS predetermined the outcome of the December 2001 rule and gave up its authority to evaluate for itself what constituted the best available scientific information, this Court finds that Federal Defendants did not violate NS 2 and further discusses Plaintiffs' argument *infra* in section B.

Plaintiffs next argue that NS 2 was violated because NMFS' decisions were not based on all available, current scientific information.  Plaintiffs contend that NMFS was required to consider information available through the time of its decisions in June and December 2001, but did not do so.

While NMFS did take the position in prior litigation that the scientific methods used in the 1998 stock assessment that formed the basis of the management measures for the 1999 HMS FMP were in accordance with NS 2, subsequent analysis of those scientific methods caused NMFS to conclude that the projections of the 1998 SEW models no longer represent the best available science. In issuing the 2002 notification, NMFS explained:

> [B]ased on the results of the independent peer reviews, NMFS no longer believes that the projections of the 1998 SEW models constitute the best available science.  As a result, some of the management measures adopted in the HMS FMP that were based on the 1998 LCS SEW models are not appropriate at this time.  Once a new LCS stock assessment is conducted and peer reviewed, NMFS will proceed with proposed and final rules to ensure any additional appropriate management measures based on this new information are in place to conserve the LCS stocks and its fishery.

A.R. Vol. III 147, at 4.

Federal Defendants concede that they had scientific documents available to them prior to December 2001, but argue that they did not at that time have the opportunity to convene the SEW to evaluate and synthesize such information and make management recommendations thereon.

NMFS chose to wait to consider new, long-term management measures during the 2002 SEW. In addition, Federal Defendants point to the fact that the Plaintiffs did not identify any particular piece of scientific information cited in the 2002 Stock Assessment and Fishery Evaluation for Atlantic Highly Migratory Species that would undermine its decision to retain the 1997 quotas pending the reconvening of the SEW.

The Court finds that the decision of a majority of the independent scientific reviewers forms a rational basis for NMFS to conclude that the projections of the 1998 SEW models upon which the 1999 HMS FMP was based no longer represent the best available science. There is an obvious lack of consensus by and between the independent reviewers and the 1998 SEW scientists regarding the adequacy of the data and analyses in the 1998 SEW Report. This gives additional support to NMFS' decision to reject that data. See Leather Indus. of Am., Inc. v. EPA, 40 F.3d 392, 406 (D.C. Cir. 1994)(an agency has significant discretion where there is genuine scientific debate regarding the use of science underlying agency action). Accordingly, the Court finds that the record contains a rational basis for maintaining the 1997 LCS quotas pending completion of a new SEW, and that Defendants did not violate NS 2 and are entitled to summary judgment on this claim.

B.      NMFS Unlawfully Delegated Its Decision-Making Authority

Plaintiffs allege that, by entering into the Amended Settlement Agreement, the Federal Defendants delegated their statutory authority and obligation to manage the LCS fishery to the NRC peer review panel thereby violating the MSA and the APA. Plaintiffs argue that the Amended Settlement Agreement explicitly stated that the LCS quotas for the 2001/2002 fishing seasons "shall" be set as follows: if most peer reviewers uphold the 1998 SEW Report, the Federal Defendants "will" adjust the quotas to the levels set by the 1999 HMS FMP; conversely, if most peer reviewers

31

reject the 1998 SEW Report, the Federal Defendants "will retain the 1997 LCS quotas pending further rulemaking." Plaintiffs contend that the mandatory language makes clear that the Federal Defendants did not retain any authority to decide LCS quotas for the 2001/2002 fishing seasons, but rather placed that decision entirely in the hands of the NRC peer reviewers. This delegation of authority, Plaintiffs argue, culminated in the December emergency rule, when Federal Defendants explicitly set the 2002 quotas at 1997 levels because the outcome of the NRC peer review dictated this result. Plaintiffs argue that the Federal Defendants' decisions to enter into the Amended Settlement Agreement and to promulgate the December emergency rule were *ultra vires*, in violation of the MSA and the APA, and Plaintiffs are therefore entitled to summary judgment on this issue.

It is well-established that federal agencies may not delegate their statutory authorities to private parties. See Perot v. Federal Election Comm'n, 97 F.3d 553, 559 (D.C. Cir. 1996). The ultimate test of the validity of an agency's delegation of responsibility to a private party is whether the delegating agency retains final decision-making authority. See Riverbend Farms v. Madigan, 958 F.2d 1479, 1488 (9th Cir.), cert. denied, 506 U.S. 999 (1992). The inquiry in this case then becomes whether, in utilizing the NRC peer review panel, NMFS retained sufficient final reviewing authority to prevent a violation of the unlawful delegation doctrine.

Plaintiffs cite to National Park & Conservation Association v. Stanton, 54 F. Supp. 2d 7 (D.D.C. 1999), in support of their argument that the Federal Defendants unlawfully delegated their decision-making authority. National Park, however, is distinguishable from the instant case on its facts. In that case, the district court found that the National Park Service entirely delegated all of its responsibilities for managing the Niobrara National Scenic River to an independent local council over which the Park Service had no control. The Secretary of the Interior delegated responsibilities

32

to the fifteen-member council, including but not limited to:  managing law enforcement, public access sites, visitor use levels, and other operational functions; retaining staff members and other professional services to perform necessary duties; and acquiring and managing real and personal property for staff purposes.  The court reasoned that the delegation was unlawful because the Park Service did not retain sufficient final reviewing authority over the local council's actions.

Unlike National Park, the use of an independent scientific panel by NMFS does not constitute a delegation of all of NMFS' responsibilities.  The NMFS retained sufficient final reviewing authority over the findings of the independent scientific panel so as to not violate the MSA and the APA.  The reviews were analyzed by NMFS staff and management decisions were based on the reviews.  For example, NMFS decided to defer implementing minimum size requirements based on the comments of the reviewers.  Accordingly, the Court finds that the Federal Defendants did not unlawfully delegate its decision-making authority.

To the extent that it can be argued that the Settlement Agreement infringed on NMFS' discretion, such infringement is legally permissible.  In Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117 (D.C. Cir. 1983), cert. denied, 467 U.S. 1219 (1984), the EPA and environmental plaintiffs entered into a settlement under the Clean Water Act (CWA).  The settlement, which was entered by the court as a consent decree, contained a detailed program for developing regulations to deal with the discharge of toxic pollutants under the CWA.  The settlement mandated that use of certain scientific methodologies and decision-making criteria for use by the EPA in determining whether additional regulations should be issued and whether other pollutants should be included in the regulatory scheme.  The United States Court of Appeals for the D.C. Circuit upheld the decree and rejected claims by pollutant dischargers that the decree unlawfully infringed on EPA's discretion

33

by compelling certain results.  The court reasoned that programs and criteria specified in the decree did not bind the agency to any particular substantive outcome but rather "establish the analytic processes that EPA must employ in formulating proposed standards."

Under the Settlement Agreement, NMFS contracted with independent scientists to aid the agency in reviewing the 1998 SEW and in making findings on whether the 1998 SEW constitutes the best scientific information available in furtherance of NS 2 of the MSA.  NMFS contends that it determined what review procedures would be utilized by these independent scientists to ensure a thorough review and reliable findings on which the agency could base management decisions.  Like Citizens, the Settlement Agreement entered into by the Federal Defendants in this case did not bind the agency to any particular substantive outcome but established the analytic processes to be used in establishing the LCS fishing quotas.  Accordingly, Federal Defendants are entitled to summary judgment on this claim.

C.     NMFS' Environmental Assessment of the December 2001 Emergency Rule Violates the National Environmental Policy Act

NEPA requires federal agencies to analyze the direct, cumulative, and long-term environmental impacts of their proposed actions and alternatives thereto.  Plaintiffs allege that the environmental assessment (EA) and finding of no significant impact (FONSI) accompanying the December 2001 rule entirely failed to analyze the environmental effects of reinstating the 1997 quotas and suspending non-quota management measures, brushed aside the cumulative and long-term effects of the rule in a conclusory manner, and failed to consider a reasonable range of alternatives. Plaintiffs additionally contend that NMFS failed to prepare the EA before deciding its course of action, and these actions violated NEPA.

34

"NEPA declares a broad national commitment to protecting and promoting environmental quality." Robertson, 490 U.S. at 348 (citing 42 U.S.C. § 4331)). "The sweeping policy goals announced in § 101 of NEPA are ... realized through a set of 'action forcing' procedures" that require agencies to take a "hard look" at the environmental consequences of their actions. Id. at 350. In other words, the statute does not set out substantive environmental standards, but instead is "primarily procedural." Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir. 2000). "[A]gency action taken without observance of the procedure required by law will be set aside." Id.

There are two kinds of documents an agency may prepare to fulfill these requirements. First, NEPA requires that an environmental impact statement (EIS), a detailed analysis of environmental impacts of the agency's actions, be prepared for all "major Federal actions significantly affecting the quality of the human environment."[16] See 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1501.4, 1502.1. Alternatively, if an agency's regulations do not categorically require the preparation of an EIS, then the agency must first prepare an EA to determine whether an action will have significant environmental impacts necessitating an EIS. If the agency decides that its action will significantly affect the environment, then an EIS must be prepared. If the agency decides that its action will not significantly affect the environment, then the agency must also prepare a finding of no significant impact (FONSI) and "provide sufficient evidence and analysis" to support its decision. See 40 C.F.R. § 1508.9(a)(1). Based upon an EA, NMFS executed a FONSI on the December 2001

---

[16] "Major federal action" does not include action taken by the Department of Justice within the framework of judicial or administrative enforcement proceedings or civil or criminal litigation, including but not limited to the submission of consent or settlement agreements and investigations." 28 C.F.R. § 61.4. Thus, the Settlement Agreement itself did not constitute a proposal for "major federal action" that triggered an EIS requirement. See also Miccosukee Tribe of Indians v. United States, 6 F. Supp. 2d 1346 1349 (S.D. Fla. 1998)(NEPA obligations do not attach to settlement agreement).

emergency rule.

An EA "[s]hall include brief discussions of the need for the proposal, of alternatives ... [and] of the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b). The Council on Environmental Quality, which promulgated the NEPA regulations, has explained that "[s]ince the EA is a concise document, it should not contain long descriptions or detailed data which the agency may have gathered... [T]he EA may incorporate by reference background data to support its concise discussion of the proposal and relevant issues." 46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981)(CEQ's 40 most frequently asked questions).

The standard of review applicable to the Court's review of the administrative record supporting the EA is provided by the APA, which allows the court to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Hill v. Boy, 144 F.3d 1446, 1450 (11th Cir. 1998). This standard is "exceedingly deferential" to the agency. See Fund for Animals v. Rice, 85 F.3d 535, 541 (11th Cir. 1996). The Court must consider whether there has been a clear error of judgment. See North Buckhead Civic Ass'n, 903 F.2d at 1538-39. The arbitrary and capricious standard gives a court the "least latitude in finding grounds for reversal"; a decision should not be set aside "simply because the court is unhappy with the results reached." Id. at 1539. In determining whether an agency's decision not to prepare an EIS is arbitrary and capricious, the court should consider three criteria: (1) whether the agency "accurately identified the relevant environmental concern"; (2) whether the agency took a "hard look" at this environmental concern in preparing the EA; and (3) if an agency issues a FONSI, whether the agency can "make a convincing case for its finding." Hill, 144 F.3d at 1450.

Plaintiffs contend that the NMFS' EA does not satisfy this test and does not meet the standards set forth in the NEPA's implementing regulations. Defendants argue that Plaintiffs cannot show that NMFS failed to consider the relevant factors and that there was a clear error of judgment. The Court finds that the record reflects that NMFS properly identified and discussed the relevant environmental concerns including the cumulative impacts; that it defined a range of alternatives sufficient to permit a reasoned choice; and that it therefore satisfied NEPA's procedural requirements. The agency's conclusion that the environmental impacts of the December 2001 rule are not significant is reasonable given the history of this case, the agency's prior analysis, the fact that the 2002 stock assessment includes developing long-term management measures, and the relatively short duration of the rule. Accordingly, Federal Defendants are entitled to summary judgment as to this claim.

D.    NMFS Unlawfully Promulgated the December 2001 Rule Without Notice and Comment

The MSA specifically requires NMFS to publish an FMP, plan amendment, or proposed regulation for highly migratory species to the Federal Register for notice and comment. See 16 U.S.C. §§ 1854(c)(4)(B); 1854(c)(6). More generally, the APA requires an agency to publish general notice of proposed rule making in the Federal Register and provide an opportunity for interested persons to participate in the rule making by submitting comments.[17] See 5 U.S.C. § 553(b) & (c).

The APA provides for an exception to the requirement for notice and comment rulemaking "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons

---

[17]In enacting the notice and comment provisions of the APA, "Congress realized that an agency's judgment would only be as good as the information upon which it drew. It prescribed these procedures to ensure that the broadest base of information would be provided to the agency by those most interested and perhaps best informed on the subject of the rulemaking at hand." Brown Exp., Inc. v. United States, 607 F.2d 695, 701 (5th Cir. 1979).

therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). This exception is to be narrowly construed and infrequently invoked. See United States Steel Corp. v. EPA, 595 F.2d 207, 214 (5th Cir.), clarified on other grounds, 598 F.2d 915 (5th Cir. 1979)[18]; State of N.J., EPA v. United States EPA, 626 F.2d 1038, 1045-46 (D.C. Cir. 1980). An agency's decision not to comply with the APA's notice and comment requirement is reviewed under the standard supplied by 5 U.S.C. § 706(2)(D) (reviewing court shall hold unlawful and set aside agency action found to be "without observance of procedure required by law.").

Plaintiffs contend that the NMFS violated the MSA and APA by failing to provide notice and an opportunity for comment on its December 2001 decision, published via emergency rule, to set the 2002 LCS quotas at 1997 levels and to continue the suspension of non-quota management measures. Plaintiffs argue that NMFS received the completed NRC reviews on October 8, 2001 and that no later than October 19, 2001, NMFS had determined that the reviews were complete according to the Statement of Task. Therefore, Plaintiffs argue, some time between October 8 and October 19, NMFS knew that it would be setting the 2002 LCS quotas at 1997 levels as per the Amended Settlement Agreement. NMFS waited more than 60 days, until December 28, 2001, to publish its emergency rule in the Federal Register. See 66 Fed. Reg. at 67,121.

The Federal Defendants relied upon the good cause exception to the requirement of a notice and comment period in publishing the emergency rule without inviting prior public comment. NMFS' statement of good cause states as follows:

_____

[18]The case law of the Fifth Circuit prior to September 30, 1981 has been adopted as precedent in this judicial circuit. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc).

> The [Assistant Administrator for Fisheries] finds that there is good cause to waive the requirement to provide prior notice and an opportunity for public comment pursuant to authority set forth at 5 U.S.C. § 553(b)(B). It would be impracticable to provide prior notice and opportunity for comment because it would prevent the agency from meeting the requirements of a court-approved settlement agreement, and ensuring that management measures in place at the beginning of the 2001 shark fishing season (January 1, 2002) are based on the best available science. If these regulations are not in place at the beginning of the 2001 shark fishing season then more restrictive management measures (e.g. lower annual landings quotas and measures to count dead discards against that lower quota) that could significantly impact the fishery, and that currently lack an adequate scientific basis, would be in place. Comments received on this emergency rule will be considered by NMFS when determining whether to extend this emergency rule for another 180 day period and during development of a new rule. The public will have additional opportunities to comment on these or similar measures during the next rulemaking process expected shortly after completion of the new stock assessments that are anticipated in early 2002.

66 Fed. Reg. 67,118, 67,121 (December 28, 2001); A.R. 3-150.

In an issues advisory dated November 28, 2001 (A.R. 3-140 at 2), NMFS elaborated on the pros and cons of a proposed and final rule with prior notice and comment:

> Another possibility is a proposed and final rule under the framework provisions of the HMS FMP. Given the short amount of time until the shark fishery opens (January 1, 2002), the comment period on a proposed rule would have to be short. This could limit input from fishermen and interested parties. Additionally, the evaluation of certain management options may be deemed to be inconsistent with the settlement agreement. However, a proposed rule could be issued after the completion of the LCS stock assessment when the emergency rule is still in effect. At that time, the agency will have a better understanding as to whether or not the emergency rule needs to be extended and the types of options available. Thus, it may be appropriate to publish an emergency rule now and a proposed and final rule after the LCS stock assessment.

Federal Defendants argue that Plaintiffs' assertion that NMFS could have provided notice and an opportunity to solicit public comment at some point after the agency determined in October that the independent reviews were complete according to the Settlement Agreement's Statement of Task is an oversimplification of the task at issue. NMFS contends that although it determined that reviews were complete for purposes of fulfilling the Statement of Task, it was not feasible for NMFS

instantaneously to assimilate the detailed findings and recommendations in the independent reviews, make tentative management decisions based on the independent reviews, solicit comments on tentative management decisions, and then review any comments and incorporate responses to them in a final rule to be issued prior to the anticipated opening of the fishery on January 1, 2002. NMFS did not complete its initial analyses concerning the substance of independent reviews (including reviews received from NRC in fulfillment of the Amended Settlement Agreement as well as reviews from CIE that were procured under the original Settlement Agreement) until early November 2002. See A.R. 3-127 (analysis dated October 29, 2001) and A.R. 3-137 (analysis dated November 14, 2001).

According to United States Steel Corp. v. EPA, 595 F.2d 207, 213 (5th Cir. 1979), the impending deadline of January 1, 2002, for opening the new fishing season does not, by itself, justify invocation of the good cause exception. Rather, the relevant inquiry is whether NMFS has demonstrated the impracticability of affording notice and comment. See id. Although Plaintiffs suggest that allowing comment was theoretically possible, the good cause exception is available when notice and comment is "impracticable, unnecessary, or contrary to the public interest," not just impossible. 5 U.S.C. § 553(b)(B).

NMFS argues that, given the amount of detailed, new scientific information that became available in late 2001, and given the agency's need internally to assimilate this information, there simply was not enough time to publish a proposed rule, if the emergency rule and the annual quota specification therein were to become effective on January 1, 2002, the start of the shark fishing season. For the rulemaking process to be meaningful, agencies must consider comments fully and respond to significant ones in publishing a final rule. See American Mining Congress v. EPA, 965

40

F.2d 759, 771 (9th Cir. 1992). Considering the amount of new scientific information that became available in late 2001, NMFS contends that it was impracticable to afford full notice and comment prior to the opening of the fishery. Further, the delay attendant upon full notice and comment procedures "would do real harm." Hawaii Helicopter Operators Ass'n v. FAA, 51 F.3d 212, 214 (9th Cir. 1995). As NMFS noted, absent the emergency rule, "more restrictive management measures (e.g., lower annual landings quotas and measures to count dead discards against that lower quota) that could significantly impact the fishery, and that currently lack an adequate scientific basis, would be in place." 66 Fed. Reg. at 67,121 (A.R. 3-150).

Under NMFS' policy guidelines for the use of emergency rules, NMFS is justified in using emergency rules where, as here, ordinary notice and comment procedures would result in adverse economic and social impacts on fishery participants. See 62 Fed. Reg. 44,421 (August 21, 1997) (A.R. 3-1 1 1). Thus, under the facts of the instant case, providing prior notice and comment would have been both impracticable and contrary to the public interest. The Court finds that NMFS properly invoked the good cause exception and is entitled to summary judgment on this claim.

E.   NMFS' Failure to Produce Documents Responsive to Plaintiffs' Document Request of July 5, 2001 Violates the Freedom of Information Act (FOIA)

On July 5, 2001, Plaintiffs sent a FOIA request to NMFS for copies of documents relating to the Settlement Agreement. On August 7, 2001, Plaintiffs received a letter from NMFS invoking the statutory provision for a ten-day extension of its time limit to respond, to August 21, 2001, under 5 U.S.C. § 552(a)(6)(B). On September 26, 2001, NMFS responded to Plaintiffs' request and identified 105 responsive documents, of which 32 were released and 73 were withheld under the

deliberative process privilege, FOIA exemption (b)(5).[19] Plaintiffs filed an administrative appeal on October 25, 2001. Plaintiffs' FOIA claim and motion for summary judgment are based on the Federal Defendants' withholding of these 73 documents. NMFS, as part of completing the Plaintiffs' administrative FOIA appeal and subsequent to Plaintiffs' motion for summary judgment, made supplemental releases on May 22, 2002, and June 3, 2002, in which they released 55 previously withheld records. NMFS continues to withhold 16 documents in part and two documents in full under exemption (b)(5). NMFS released segregable portions of the sixteen documents to Plaintiffs. Pursuant to <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), <u>cert. denied</u>, 415 U.S. 977 (1974), the Federal Defendants have prepared and filed with the Court an index and a supporting affidavit to substantiate the basis for continuing to withhold the remaining 18 documents in full or in part under FOIA exemption (b)(5). <u>See</u> Exhibit 1, Federal Defendants' Combined Memorandum (Doc. No. 45)(Vaughn declaration and index). Federal Defendants now claim that Plaintiffs' FOIA claim is moot. Plaintiffs suggest that "[w]hile the Court cannot undo the harm caused by NMFS' improper dely in releasing these 55 documents, it should ensure the integrity of the administrative record, and the legitimacy of NMFS' remaining claims of privilege, by reviewing the remaining withheld documents <u>in camera</u>."

The Court agrees that Plaintiffs' FOIA claims concerning the records already disclosed are moot. Under 5 U.S.C. § 552(a)(4)(B), a federal court is authorized to only "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld . . . ." Once the court is convinced that the government has, "however belatedly, released all

---

[19]FOIA exemption 5 allows the government to withhold "inter-agency or intra-agency memorandums [sic] or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 522(b)(5).

nonexempt material," it has no further judicial function to perform under the FOIA. Perry v. Block, 684 F.2d 121, 125 (D.C. Cir. 1982). Thus, "[o]nce the records are produced the substance of the controversy disappears and becomes moot since the disclosure which the suit seeks has already been made." Crooker v. United States State Dep't, 628 F.2d 9, 10 (D.C. Cir. 1980).

Accordingly, the only issue that remains before the Court is whether the remaining 18 documents being withheld in part or in their entirety should be subject to an *in camera* review by the Court. FOIA explicitly authorizes *in camera* review. 5 U.S.C. § 552(a)(4)(b). To "ensure the breadth of disclosure" required by FOIA, courts are authorized "to examine documents *in camera* when reviewing the propriety of an agency's withholdings." Rugiero v. United States Dep't of Justice, 257 F.3d 534, 543 (6th Cir. 2001), cert. denied, 534 U.S. 1134 (2002). District court judges have "broad discretion in determining whether *in camera* review is appropriate." Armstrong v. Executive Office of the President, 97 F.3d 575, 577-78 (D.C. Cir. 1996). In deciding whether to undertake an *in camera* review, the court should take consideration of the following factors: (1) judicial economy; (2) actual agency bad faith, either in FOIA action or in the underlying activities that generated the records requested; (3) strong public interest; and (4) whether the parties request in camera review. See, e.g., Rugiero, 257 F.3d at 543.

Unless evidence contradicts the government's affidavits or establishes bad faith, the Court's primary role in reviewing a government's claimed exemption under FOIA is not to conduct *in camera* review but rather to review the adequacy of the affidavits and other evidence. See Ingle v. Department of Justice, 698 F.2d 259, 267 (6th Cir. 1983), overruled on other grounds by, United States Dep't of Justice v. Landano, 508 U.S. 165 (1993); see also Center for Auto Safety v. EPA, 731 F.2d 16, 20 (D.C. Cir. 1984)(quoting legislative history of FOIA and Congress' intent that,

before court orders *in camera* inspection, "the Government should be given the opportunity to establish by means of testimony or detailed affidavits that the documents are clearly exempt from disclosure"); <u>Silets v. United States Dep't of Justice</u>, 945 F.2d 227, 231 (7th Cir. 1991)(citing <u>Kimberlin v. Dep't of Treasury</u>, 774 F.2d 204 (7th Cir. 1985)(*in camera* review under FOIA is discretionary by its terms and should be invoked only when the exemption issue before the district court cannot otherwise be resolved)); <u>National Labor Relations Bd. v. Robbins Tire & Rubber Co.</u>, 437 U.S. 214, 224 (1978)(*ex parte in camera* review is a last resort, given that it furthers judicial review by abrogates the adversary process to a significant extent); <u>Stein v. Department of Justice</u>, 662 F.2d 1245, 1253 (7th Cir. 1981)(explicitly endorsed the initial use of a <u>Vaughn</u> index as the sole basis of decision where the descriptions contained therein are "reasonably specific"; such information as is described "falls logically within the claimed exemption"; and there is no contrary evidence or "evidence of agency bad faith"); <u>Weissman v. CIA</u>, 565 F.2d 692, 698 (D.C. Cir. 1977)(the court is entitled to accept the credibility of the <u>Vaughn</u>, so long as it has no reason to question the good faith of the agency).

The Court finds no evidence of bad faith on the part of NMFS in initially withholding the 73 documents requested. Further, the Vaughn declaration and index clearly describes the withheld documents' contents and bases for the privilege assertions. Accordingly, the Court finds that an *in camera* inspection of the 18 documents being withheld in part or in whole is unnecessary.

NMFS bears the burden of establishing that the withheld documents are exempt from disclosure, and the Court is "the ultimate arbiter" of whether NMFS has provided an adequate factual basis to support its claim of privilege. <u>See</u> <u>Miscavige v. IRS</u>, 2 F.3d 366 (11th Cir. 1993); <u>Ely v. FBI</u>, 781 F.2d 1487, 1489-90 (11th Cir. 1986).

The Court is satisfied that NMFS has provided the complete administrative record in response to the Plaintiffs' FOIA request. NMFS has established through its <u>Vaughn</u> declaration and index that the withheld documents are exempt from disclosure under FOIA exemption (b)(5) based upon privileges set forth in the <u>Vaughn</u> declaration and index. Accordingly, summary judgment on this claim is granted in favor of NMFS.

## III. CONCLUSION

Plaintiffs have failed to carry their burden at summary judgment of showing that NMFS' actions under the disputed Settlement Agreement and Amended Settlement Agreement were arbitrary and capricious or otherwise in violation of the MSA or any other applicable law.

Accordingly, it is **ORDERED AND ADJUDGED** that:

(1)   Plaintiffs' Motion for Summary Judgment (Doc. No. 36) is **DENIED**.

(2)   Federal Defendants' Motion for Summary Judgment (Doc. No. 44) is **GRANTED**.

(3)   Defendant-Intervenors' Motion for Summary Judgment (Doc. No. 48) is **GRANTED**.

(4)   Each party is to bear its own costs and attorneys' fees.

(5)   The Clerk is directed to enter judgment in favor of Donald L. Evans, in his official capacity as Secretary of the U.S. Department of Commerce, the National Oceanic & Atmospheric Administration, the National Marine Fisheries Service, Southern Offshore Fishing Association, Robert Spaeth, Fisherman's Ice & Bait, Inc. d/b/a Madeira Beach Seafood, Willie R. Etheridge Seafood Co., Inc., Russell Hudson, Dewey Hemiliright, and Agger Fish Corporation and **CLOSE** Case No. 8:01-cv-1399-T-24EAJ and Case No. 8:02-cv-163-T-24EAJ.

**DONE AND ORDERED** at Tampa, Florida, this ___31^st___ day of March, 2003.


SUSAN C. BUCKLEW
United States District Judge

Copies to:

Counsel of Record

46

F I L E   C O P Y

Date Printed: 03/31/2003

Notice sent to:   BN 01 - 1399

　　　____ Jane P. Davenport, Esq.
　　　　　 Ocean Conservancy
　　　　　 1725 DeSales St., N.W., Suite 600
　　　　　 Washington, DC  20036

　　　____ Marlyn Twitchell, Esq.
　　　　　 National Audobon Society
　　　　　 7 Braxton Rd.
　　　　　 Rosemont, PA  19010

　　　____ Aliki A. Moncrief, Esq.
　　　　　 Earthjustice Legal Defense Fund, Inc.
　　　　　 P.O. Box 1329
　　　　　 Tallahassee, FL  32302

　　　____ Coby Dolan, Esq.
　　　　　 Earthjustice Legal Defense Fund, Inc.
　　　　　 P.O. Box 1329
　　　　　 Tallahassee, FL  32302

　　　____ Mark A. Brown, Esq.
　　　　　 Wildlife & Marine Resources Section
　　　　　 Environment & Natural Resources Div.
　　　　　 U.S. Dept. of Justice, Ben Franklin Stn.
　　　　　 P.O. Box 7369
　　　　　 Washington, DC  20044-7369

　　　____ Michael Rubinstein, Esq.
　　　　　 U.S. Attorney's Office
　　　　　 Middle District of Florida
　　　　　 400 N. Tampa St., Suite 3200
　　　　　 Tampa, FL  33602

　　　____ Charles Paul Schropp, Esq.
　　　　　 Schropp, Buell & Elligett, P.A.
　　　　　 3003 W. Azeele St., Suite 100
　　　　　 Tampa, FL  33609-5226

　　　____ David E. Frulla, Esq.
　　　　　 Brand Lowell & Ryan, P.C.
　　　　　 923 15th St., N.W.
　　　　　 Washington, DC  20005

　　　____ Corey A. Rubin, Esq.
　　　　　 Brand Lowell & Ryan, P.C.
　　　　　 923 15th St., N.W.
　　　　　 Washington, DC  20005